**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED MAY 30, 2001**

*In re* HON. JOHN M. CHMURA (AFTER REMAND),
Judge of the Thirty-Seventh District Court,
Warren, Michigan.

No. 117565

_____

**BEFORE THE ENTIRE BENCH**

**MARKMAN, J.**

This judicial disciplinary matter is before this Court after remand to the Judicial Tenure Commission (JTC) to determine whether certain public communications engaged in by the respondent during a judicial election campaign violated the Code of Judicial Conduct, Canon 7(B)(1)(d). In *In re Chmura*, 461 Mich 517; 608 NW2d 31 (2000) (*Chmura I*), we held that Canon 7(B)(1)(d) was facially unconstitutional. We thereupon narrowed the language of Canon 7(B)(1)(d), holding that a judicial candidate "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false." We further held that, in determining whether a judicial candidate engaged in a public communication with reckless disregard of its truth or

falsity, the communication must be analyzed to determine if the communication was supported by reasonable facts. Finally, we remanded the present matter to the JTC to determine whether respondent's conduct violated Canon 7(B)(1)(d), as narrowed. The JTC subsequently determined that respondent's communications violated the amended version of Canon 7(B)(1)(d). Upon review, however, we respectfully disagree with the JTC and conclude that such communications were not false. Accordingly, we reject the JTC's recommendation to suspend respondent from the performance of his judicial duties without pay for ninety days. MCR 9.225.

## I. PROCEDURAL HISTORY

This judicial disciplinary matter concerns certain advertising disseminated by respondent's campaign committee during his 1996 election contest for 37th District Court Judge in Warren and Center Line. In this contest, respondent ran against, and defeated, 37th District Court Administrator/Magistrate James P. Conrad.

In April 1998, the JTC filed a complaint against respondent alleging that four of his campaign communications contained "false, fraudulent, deceptive, and misleading" statements in violation of the Code of Judicial Conduct Canon 7(B)(1)(d).[1] At the time the JTC filed its complaint against

---

[1] The JTC's complaint initially alleged six violations of Canon 7(B)(1)(d). However, it eventually concluded that two of the six communications did not violate Canon 7(B)(1)(d).

2

respondent, Canon 7(B)(1)(d) stated in pertinent part:

> (1) A candidate, including an incumbent judge, for a judicial office:
>
> * * *
>
> (d) should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about results the candidate can achieve.

A. FINDINGS

As a result of the JTC's complaint against respondent, this Court appointed the Honorable John P. Kirwan to serve as master. Following an evidentiary hearing, Judge Kirwan issued a two-part report. In the first part of the report, Judge Kirwan determined that Canon 7(B)(1)(d) was facially unconstitutional because it was overbroad and vague. He concluded that, although the state has the power to regulate a judicial candidate's speech, the propriety of a regulation hinges upon whether a compelling state interest exists and whether the regulation is narrowly crafted to avoid the infringement of constitutional rights of free speech. Judge Kirwan determined that the state had a compelling interest in overseeing and regulating judicial elections; however, he also determined that the text of Canon 7(B)(1)(d) was not sufficiently specific to clearly apprise judicial candidates

3

regarding the boundaries of what they could and could not permissibly say. He then reasoned that, in cases involving restrictions upon political speech, the judicial canons should restrict only public communications that are false or made with reckless disregard for their truth or falsity, i.e., that Canon 7(B)(1)(d) should only prohibit public communications made with "actual malice," citing *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710; 11 L Ed 2d 686 (1964).

The second part of Judge Kirwan's report assumed the constitutionality of Canon 7(B)(1)(d). In so assuming, he explained that allegedly deceptive or misleading public communications must be evaluated in the context of whether a voter of average intelligence would have been misled by the communication. Judge Kirwan further asserted that statements must be "clearly" untrue and that obvious statements of opinion did not violate Canon 7(B)(1)(d). After an examination of the communications in question, he concluded that they did not violate Canon 7(B)(1)(d) because an "average intelligent voter would not have been misled by the messages conveyed to the electorate."

Respondent and the JTC examiner both filed written objections to Judge Kirwan's report with the JTC. The JTC then conducted a hearing and thereafter determined that respondent's campaign communications, viewed individually and as a whole, revealed a "conscious effort to use false, fraudulent, misleading, and deceptive statements as part and parcel of his campaign strategy." The JTC therefore recommended that this Court suspend respondent from

4

performance of all judicial duties without pay for a period of ninety days.  With regard to Judge Kirwan's conclusion that Canon 7(B)(1)(d) was overbroad, the JTC disagreed and instead determined that Canon 7(B)(1)(d) was drafted with sufficient precision.   In particular, the JTC asserted that Canon 7(B)(1)(d) only applied when a judicial candidate "has knowledge [that] a communication is false, fraudulent, misleading, or deceptive."

Moreover, the JTC determined that Canon 7(B)(1)(d) was not constitutionally vague.  It asserted that there was no case law holding unconstitutional a judicial canon prohibiting "false, fraudulent, deceptive, or misleading" political speech by judges, and that states possess the authority to regulate misleading statements made in the course of judicial campaigns.  The JTC expressed doubt about whether any "actual malice" standard applied to judicial disciplinary matters, but alternatively determined that, in the event such a standard applied, respondent nevertheless acted with "actual malice." Respondent filed a petition with this Court to reject the JTC's decision.


## B.  CHMURA I

In *Chmura I*, we examined whether Canon 7(B)(1)(d) violated the First Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment.  *Gitlow v New York*, 268 US 652, 666; 45 S Ct 625; 69 L Ed 1138 (1925).

We began our analysis by focusing on whether Canon

5

7(B)(1)(d) was unconstitutionally overbroad on its face. *Chmura I, supra* at 530. Upon examination of Canon 7(B)(1)(d), we determined that respondent properly challenged the canon on overbreadth grounds because the canon potentially authorized disciplinary action on the basis of the substantive content of a candidate's speech. Because Canon 7(B)(1)(d) implicated a First Amendment issue, we accordingly applied an exacting scrutiny analysis to determine if the canon was sufficiently narrowly tailored to serve compelling state interests. *Id.* at 531-532.

Although we identified numerous compelling interests in support of the canon, especially the state's interest in preserving the integrity of the judiciary and its election process, we nevertheless determined that the canon was insufficiently narrowly drawn. *Id.* at 534-535. Specifically, we noted that Canon 7(B)(1)(d) applied to any statement that the candidate "reasonably should know is false, fraudulent, misleading, [or] deceptive," statements that "contain[] a material misrepresentation of fact or law," or that "omit a fact necessary to make the statement considered as a whole not materially misleading," and statements that are "likely to create an unjustified expectation about results the candidate can achieve." *Id.* at 536-537. While such prohibitions were equivalent to the types of prohibitions placed on commercial speech, such as attorney advertising, Canon 7(B)(1)(d) does not regulate commercial speech but instead regulates political speech. Political speech is "'at the core of our electoral process and of the First Amendment freedoms' . . . an area of

public policy where protection of robust discussion is at its zenith." *Meyer v Grant*, 486 US 414, 425; 108 S Ct 1886; 100 L Ed 2d 425 (1988). Because the central purpose of the First Amendment speech clause is to protect core political speech, we determined that political speech may not be regulated in the same manner that commercial speech is regulated.

> [T]o require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. [*Chmura I, supra* at 538.]

Therefore, more latitude must necessarily be given for political speech than for commercial speech. We then turned to Canon 7(B)(1)(d) and concluded that it covered "all statements, not merely those statements that bear on the impartiality of the judiciary." *Id.* at 539. In so doing, the canon reached too far. Our concern was that, under the existing canon, judicial candidates, rather than engaging in robust political give-and-take, might well conclude that the safer course of action was to remain silent on controversial issues lest the canon be inadvertently breached. *Id.* This concern has been shared by the United States Supreme Court, which has remarked in the context of a discussion of political speech that the state cannot "'select which issues are worth discussing or debating' . . . in the course of a political campaign." *Brown v Hartlage*, 456 US 45, 60; 102 S Ct 1523; 71 L Ed 2d 732 (1982). The reason is that free political speech is, in effect, a structural protection for democracy. *Richmond Newspapers, Inc v Virginia*, 448 US 555, 587; 100 S Ct

7

2814; 65 L Ed 2d 973 (1980) (Brennan, J., concurring).  In sum, core political speech cannot be chilled by the subtle deterrent effects of  vague and ambiguous limitations.

Yet, clearly there is something different about judicial campaign speech that all the courts that have dealt with this issue have recognized.  There is a tension that exists between the regulation of judges as officers of the court, and the regulation of judges as candidates in the political process.[2] This Court, for example, is obligated to ensure that a judge acts with the "highest standards of personal and professional conduct" so that the administration of justice is not compromised.  *In re Bennett*, 403 Mich 178, 193; 267 NW2d 914 (1978) (citing the Code of Judicial Conduct); Const 1963, art 6, § 30.  At the same time, with regard to a judge who has assumed the role of a political candidate (a role that the people of Michigan by their constitution have made clear that they wish periodically to cast upon members of their judiciary), there are demands of the democratic process that must also be respected.  The "First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office."  *Eu v San Francisco Co Democratic Central Comm*, 489 US 214, 223; 109 S Ct 1013; 103

---

[2]  The United States Supreme Court, in *Chisom v Roemer*, 501 US 380, 400-401; 111 S Ct 2354; 115 L Ed 2d 348 (1991), has recognized the tension that arises between the ideals of judicial office and the real world of politics, in observing that the "[f]undamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office."

8

L Ed 2d 271 (1989), quoting *Monitor Patriot Co v Roy*, 401 US 265, 272; 91 S Ct 621; 28 L Ed 2d 35 (1971).  Thus, we believe that a rule, such as the revised Canon 7(B)(1)(d), prohibiting a judicial candidate from only knowingly or recklessly making a false communication, strikes a reasonable constitutional balance between the candidate's First Amendment rights and the state's interest in preserving the integrity of the judicial system.[3]  *Chmura I, supra* at 544. Moreover, First Amendment concerns are substantially different in a system in which the judiciary is selected in a democratic process by the electorate.  Allowing elected judges relatively unfettered breathing room ensures that the electorate acts as the primary, although not exclusive, check on judicial integrity and fitness for office.[4]

With this in mind, and because the existing Canon 7(B)(1)(d) was not sufficiently narrowly tailored, we revised the canon to state that a judicial candidate "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false." *Chmura I, supra* at 541.  Limiting the reach of the canon, in our judgment, ensured that judicial candidates would have the "necessary breathing space for freedom of expression" and

---

[3]  This "balance" must be assessed in light, not only of Canon 7(B)(1)(d), but in light of the full range of limitations placed upon judicial conduct by the Code of Judicial Conduct.

[4]  In contrast, appointed and life-tenured federal judges have principally self-regulation as the primary effective check with regard to their behavior in office.

ensured that the citizenry ultimately would sit as arbiters of undesirable speech that falls short of being false. *Id.* at 542.

In *Chmura I*, we further held that in determining whether a candidate recklessly disregarded the truth or falsity of a public communication, the communication is to be analyzed by an "objective person" standard. *Id.* at 542. We opined—that application of a subjective standard was inappropriate because a subjective test "would immunize all accusations, however reckless or irresponsible, from censure as long as the attorney uttering them did not actually entertain serious doubts as to their truth . . ." *Chmura I, supra* at 543. Under an "objective person" standard, a judicial candidate may make "statements that are supported by a reasonable factual basis, even if the candidate turns out to be mistaken." *Id.* at 544. We therefore remanded this case to the JTC for a determination of whether respondent engaged in misconduct under Canon 7(B)(1)(d), as modified. *Id.* at 545.

## C. AFTER REMAND

After remand, the JTC reaffirmed its previous findings of fact and concluded that respondent's conduct violated Canon 7(B)(1)(d), as narrowed by this Court in *Chmura I*. The JTC began its analysis by asserting that judges are held to the "highest standards of personal and professional conduct." In accordance with this principle, Canon 7(B)(1)(d) places limits on the boundaries of judicial campaign conduct.

As a threshold matter, the JTC stated that respondent, at

10

the time of the campaign, was aware of the obligations imposed by Canon 7(B)(1)(d) and was accountable for the contents of his campaign literature. The JTC then reviewed the four campaign communications in question and determined that, individually and collectively, they revealed a "conscious effort [by respondent] to use false statements and to use them with reckless disregard for their truth or falsity as part and parcel of his campaign strategy." According to the JTC, respondent's strategy was to "wage a 'brass knuckles' campaign" to retain judicial office because respondent "regard[ed] himself as an outsider faced with a hostile environment at the 37th District Court." Offended by this, the JTC concluded that respondent's conduct constituted misconduct in office, with such conduct being clearly prejudicial to the administration of justice. In so concluding, the JTC recommended that this Court suspend respondent from the performance of all judicial duties without pay for ninety days. Respondent again petitioned this Court to reject the JTC's decision and recommendation.

## II. APPELLATE STANDARDS

### A. STANDARD OF REVIEW

We review the JTC's decision and recommendation de novo. *In re Mikesell*, 396 Mich 517, 520; 243 NW2d 86 (1976), citing *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971). Thus, it is necessary to review the record in the present case in its entirety to determine whether respondent's public

11

communications violated Canon 7(B)(1)(d).[5]

### B.  BURDEN AND STANDARD OF PROOF

The language used in Canon 7(B)(1)(d) has its roots in defamation law.  *New York Times Co, supra*.  Thus, we examine defamation case law for guidance in analyzing whether a judicial candidate knowingly, or with reckless disregard, has used or participated in the use of any form of public communication that is false.

As a preliminary matter, however, it is necessary to identify the applicable burden and standard of proof.  At early common law, the defendant bore the burden of proving the truthfulness of an allegedly defamatory statement. *Philadelphia Newspapers, Inc v Hepps*, 475 US 767, 776; 106 S Ct 1558; 89 L Ed 2d 783 (1986).  However, this common-law rule came to be viewed as overly restrictive of free speech.

> A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable "self-censorship."  Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. . . . Under such a rule, would-be critics of official conduct may be deterred from

---

[5]  Moreover, a de novo standard of review is in accord with United States Supreme Court precedent that holds that in cases involving freedom of expression issues, appellate courts have "an obligation to 'make an independent examination of the whole record' in order to ensure that 'the [lower court's] judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp v Consumers Union of United States*, Inc, 466 US 485, 499; 104 S Ct 1949; 80 L Ed 2d 502 (1984), quoting *New York Times Co, supra* at 284-286; see also *Rouch v Enquirer & News of Battle Creek Michigan (After Remand)*, 440 Mich 238; 487 NW2d 205 (1992).

voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. . . . The rule thus dampens the vigor and limits the variety of public debate. [*New York Times, supra* at 279.]

Thus, the common-law rule requiring a defendant to prove the truthfulness of his statements was superseded by the constitutional rule (of the First Amendment) that the plaintiff, in a defamation action, must show the falsity of a statement. *Philadelphia Newspapers, Inc, supra* at 776; *New York Times Co, supra* at 279-280. Moreover, the plaintiff was required to show, by clear and convincing evidence, that the defendant acted with "actual malice" when he related the defamatory falsehood. See, e.g., *Harte-Hanks Communications, Inc v Connaughton*, 491 US 657, 686; 109 S Ct 2678; 105 L Ed 2d 562 (1989); *Bose Corp v Consumers Union of United States, Inc*, 466 US 485, 511; 104 S CT 1949; 80 L Ed 2d 502 (1984). "Judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of `actual malice'." *Harte-Hanks Communications, Inc, supra* at 686, quoting *Bose Corp, supra* at 511.

In light of this, we are persuaded that, in cases involving a violation of Canon 7(B)(1)(d), the JTC, as the moving party, has the burden of proving, by clear and convincing evidence, that the communications in question are proscribed by the canon. Clear and convincing evidence is

13

evidence that "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995), quoting *In re Jobes*, 108 NJ 394, 407-408; 529 A2d 434 (1987).

### III. "FALSE" COMMUNICATIONS

When analyzing whether a judicial candidate has violated Canon 7(B)(1)(d), it is necessary that the communication be false.[6] *Chmura, supra* at 541. However, before a judicial candidate's public communication is tested for falsity, the communication at issue must involve objectively factual matters. *Milkovich v Lorain Journal Co*, 497 US 1, 18-19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). Speech that can reasonably be interpreted as communicating "rhetorical hyperbole," "parody," or "vigorous epithet" is constitutionally protected. *Id.* at 17. Similarly, a statement of opinion is protected as long as the opinion "does not contain a provably false factual connotation . . . " *Id.* at 20. We are mindful that in

---

[6] It is important to highlight that Canon 7(B)(1)(d) proscribes conveying a false "communication." Conveying a false "communication" may not always be the same thing as conveying a false "statement." A "communication" implies the broader act of imparting ideas or information, while a "statement" may be viewed as a more discrete component of such communication. Generally, but not always, a communication will be comprised of several statements. The point of inquiry under Canon 7(B)(1)(d) will always be on the "communication."

protecting hyperbole, parody, epithet, and expressions of opinion, some judicial candidates may inevitably engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co, supra* at 270. As a result of these attacks, "political speech by its nature will sometimes have unpalatable consequences." *McIntyre v Ohio Elections Comm*, 514 US 334, 357; 115 S Ct 1511; 131 L Ed 2d 426 (1995). Indeed, as is arguably true in the present case, even potentially misleading or distorting statements may be protected.[7] However, we believe that these rules are necessary in light of our "profound national commitment to the principle that debate [by judicial candidates] on public issues should be uninhibited, robust, and wide-open . . . " *New York Times Co, supra* at 270.[8] Once it has been determined that a communication contains objectively factual matters, those matters must then be tested to determine whether they are true or false.

The concept of falsity was discussed by the United States Supreme Court in *Masson v New Yorker Magazine, Inc,* 501 US

---

[7] Requiring candidates to avoid "misleading" the electorate would hinder protected speech as candidates sought to avoid, perhaps inadvertently, violating this broad rule. *Butler v Alabama Judicial Inquiry Comm*, 111 F Supp 2d 1224, 1237 (MD Ala, 2000).

[8] It is important to note that political candidates who are faced with potentially misleading or distorted statements from their opponents may always counterbalance any negative effect with *more* speech in order to clarify potentially unfair or misleading statements or to demonstrate the nature of their opponent's conduct. In fact, in this case, the record indicates that James Conrad did vigorously respond to respondent's advertisements by asserting that respondent's campaign was "vicious" and "full of lies."

496; 111 S Ct 2419; 115 L Ed 2d 447 (1991). See also *Milkovich, supra.* "The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. . . . It overlooks minor inaccuracies and concentrates upon substantial truth." *Masson, supra* at 516, citing Restatement Torts, 2d, § 563, at 163, comment C (1977); Prosser & Keeton, Torts (5th ed), § 111, at 776. As long as "the substance, the gist, the sting" of the communication is true, minor inaccuracies do not amount to falsity. *Masson, supra* at 517. In other words, the communication "is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* This test has been commonly referred to as the "substantial truth doctrine." *Rouch v Enquirer & News of Battle Creek Michigan (After Remand)*, 440 Mich 238, 260; 487 NW2d 205 (1992). This Court applied this doctrine in *Rouch*, asserting that the constitutional requirement for testing falsity mirrors Michigan's common law. *Id*. As the Court held, "The common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail." *Id*. at 258.

The "substantial truth doctrine" has in substance, if not in name, been applied to cases in which the defendant gets the details or particulars correct but conveys a *potentially* false communication. See, e.g., *Locricchio v Evening News Ass'n* 438 Mich 84, 123-127; 476 NW2d 112 (1991)(discussing defamation by implication); *Hawkins v Mercy Health Services, Inc* 230 Mich App 315; 583 NW2d 725 (1998); *see also* Prosser Torts (5th ed),

16

§ 116, at 117 (1988 supp). However, we believe that because a judicial candidate's communication could be interpreted in "numerous, nuanced ways, a great deal of uncertainty would arise as to the message conveyed." See, e.g., *Auvil v CBS "60 Minutes,"* 67 F3d 816, 822 (CA 9, 1995)(discussing uncertainty that can arise regarding messages conveyed by broadcast media). This type of uncertainty would often make it difficult for judicial candidates to predict whether their communications would be encompassed within the proscriptions of Canon 7(B)(1)(d). Such uncertainty, as we have discussed earlier in this opinion, "raises the spectre of a chilling effect on speech." *Id.*

Accordingly, we conclude that in analyzing whether a judicial candidate has violated Canon 7(B)(1)(d), the public communication must be analyzed to determine whether the statements communicated are literally true. If so, the judicial candidate will not be in violation of Canon 7(B)(1)(d). However, if the communication conveys an inaccuracy, the communication as a whole must be analyzed to determine whether the "the substance, the gist, the sting" of the communication is true despite the inaccuracy. In other words, we must decide whether the communication is substantially true. If so, the judicial candidate will not be in violation of the canon. However, if "the substance, the gist, the sting" of the communication is false, then it can be said that the judicial candidate "used or participated in the use of a false communication." Once this has been determined,

the inquiry then turns to whether a judicial candidate's communication was made knowingly or with reckless disregard. *Chmura I, supra* at 544. If it was, the candidate has acted in violation of Canon 7(B)(1)(d).

### IV. APPLICATION

Although legitimate questions might be raised about the seemliness of some of respondent's communications, it is ultimately not our task to pass upon such matters because we have no greater competence in this regard than does the citizenry as a whole. Neither we, nor the JTC, are arbiters of propriety. Rather, that assignment belongs to "We the People." This Court's responsibility is the more narrow one of determining whether respondent's campaign communications violated Canon 7(B)(1)(d). In doing so, we apply the aforementioned principles of falsity to determine whether respondent's public communications were clearly shown by the JTC to be knowingly false or used with reckless disregard as to their truth or falsity.

Because the four campaign communications at issue were sufficiently described by this Court in *Chmura I,* we quote, in turn, their descriptions before our discussion on each.

### A. EXHIBIT 1

Exhibit 1 is a two-page flier entitled "Robin Hood?" The cover portrays former Detroit Mayor Coleman Young as a Robin Hood figure. The left page inside the flier contains a photograph of Mayor Young above the following text: "Coleman Young wanted your money, but one man stood in the way . . . Judge John Chmura." The right page contains a photograph of respondent. The text on that page states that "Coleman Young and the

18

Lansing crowd cooked up a plan to take your tax dollars and spend them on Detroit's school districts. They called it Robin Hood—they stole from our taxpayers, our schools and our children to help prop up Coleman Young." It describes respondent's actions as "standing up to Coleman Young" and "standing up for your children." The text characterizes respondent's role in the lawsuit challenging the statutory scheme as taking "the state to court, arguing one appeal after another, until the state backed down and allowed your kids to benefit from your hard-earned tax dollars." Under the subheading "One Tough Judge," the text relates respondent's involvement in term limits and anti-taxation causes before taking the bench. It further states that, as a judge, respondent has conducted himself in accordance with his prior actions by taking "one criminal after another off our streets." The flier then repeats that respondent is "always standing up for what's right." It also reiterates that respondent is "one tough judge." The back page of the flier contains a photograph of respondent with his family and lists his professional and civic affiliations. [*Chmura I, supra* at 520].

In its decision, the JTC asserted that respondent inaccurately characterized Detroit Mayor Coleman Young's role in the property tax base sharing (PTBS) legislation[9]– legislation that respondent described as "Robin Hood" legislation. In particular, the JTC stated that there was "no credible evidence that Coleman Young, with or without the help of others from Lansing, planned, drafted or even actively supported the measure." However, in citing this lack of evidence on the respondent's part, the JTC improperly shifted the burden of proof to respondent on this issue. The burden of proof here does not lie with respondent but with the JTC. They failed to present clear and convincing evidence that

---

[9] MCL 380.751 *et seq.*; MSA 15.4751 *et seq.*, repealed by 1993 PA 175.

19

proved the *falsity* of the communication. That is, they did not make any showing that Young did *not* support the PTBS legislation.[10] See, e.g., *Harte-Hanks Communication Inc, supra* at 686.

Next, the JTC determined that exhibit 1 falsely communicated that respondent had "prevented Coleman Young and others from taking tax . . . [revenue] from Warren and Center Line property owners to spend on the Detroit school system."[11] The JTC again referenced the PTBS legislation and explained that, under the provisions of the act, tax revenue from the Warren and Center Line School Districts could not be directly shifted to the Detroit School District.

Further, on the basis of these two findings—that Warren and Center Line tax revenue could not, in the JTC's view, be directly shifted to the city of Detroit, and that there was no proof that Coleman Young was involved with the legislation—the

---

[10] The propriety of placing the burden of proof upon the JTC is not a mere technicality, but rather is underscored by the specific matter in controversy here. It is not at all obvious to this Court why the mayor of the largest city in Michigan would *not* have been involved in encouraging the enactment of legislation resulting in the transfer of substantial amounts of tax revenues into that city in order to bolster school finances. Upon a closer review, it may well be shown that neither the mayor nor his representatives or lobbyists, either directly or indirectly, communicated the views of the city to either the Governor or to members of the Legislature; however, it would hardly be surprising if such a review demonstrated the contrary. In any event, this is a matter for the JTC to prove, not for the respondent to disprove.

[11] The JTC acknowledges that respondent, as a private attorney, challenged the constitutionality of the PTBS legislation. The JTC contends that it is respondent's statements about the means by which the legislation shifted money from one school district to another that was false.

20

JTC concluded that the brochure was an effort on the part of respondent to appeal to "racist attitudes among the electorate." It noted, however, that the use of the allegedly racist advertisement, alone, did not fall within the prohibitions of Canon 7(B)(1)(d), but concluded that because it was "coupled with the false statements, the ad is convincing and clear evidence of the [r]espondent's reckless disregard for the truth."

Contrary to the JTC, we find that respondent did not "falsely" communicate that he prevented Coleman Young and others from taking tax dollars from the cities of Warren and Center Line to spend on the Detroit school system. In 1991, the PTBS legislation was enacted by the Michigan Legislature in an effort to address disparities in school spending that resulted from a variance in the property tax base in Michigan school districts. MCL 380.751 *et seq.*; MSA 15.4751 *et seq.* To accomplish this, subsections 751(1)(h) and (i) classified state school districts into two regions, region 1 and region 2. Within each region, a school district would be classified as an "out-of-formula" or an "in-formula" school district. MCL 380.751(1)(e)(f); MSA 15.4751(1)(e)(f). The "out-of-formula" school districts were those that generally had higher property tax revenues, while the "in-formula" school districts were those that generally had lower property tax revenues. Because the "out-of-formula" districts typically generated more tax revenues, § 752 of the legislation required that such school districts share a portion of their tax revenues with the "in-formula" school districts in their own regions. Under

21

the legislation, the Warren and Center Line School Districts were located in region 1 and were determined to be "out-of-formula" school districts. The Detroit School District, on the other hand, was located in region 2 and was an "in-formula" school district. Thus, at first blush, it appears that Warren's and Center Line's tax revenues would be shared with "in-formula" school districts within region 1, which did not include the Detroit School District. However, subsection 752(3) further provided that in the event that

> the department determines that the total amount of aid per in-formula district pupil paid under subsection (2)(a) and (b) in a region in a state fiscal year varied by more than 10% from the state average amount paid per in-formula district pupil paid under subsection (2)(a) and (b) in that state fiscal year, the department shall submit a report [to the legislature and the governor] . . . Unless the legislature enacts legislation . . . that redefines the boundaries of each region to reduce the variance to 10% or less . . . each out-of-formula district shall make payments to the chief financial officer . . . and that individual shall make payments to each in-formula district as if the entire state were a single region . . .

On the basis of the above provision, it is clear that the PTBS legislation clearly contemplated that tax revenue potentially could be shifted directly from the Warren and Center Line School Districts to the Detroit School District. The fact that Warren's and Center Line's tax revenues would not have *initially* been transferred directly to the city of Detroit does not make respondent's communication false, given the overall legislative scheme of the act. Accordingly, respondent's claim that he "prevented" Coleman Young and others from taking tax revenue from Warren and Center Line

22

property owners is not false.[12]

We further believe that the JTC improperly found, as "racist," the Robin Hood caricature, which had, as its head, a photograph of Coleman Young. Instead, we conclude that the mayor's image was used merely as a well-understood *symbol* for the city of Detroit and its school district. Further, we believe that the use of Coleman Young's photograph can be seen as an effort to convey a "suburban" versus "urban" tension implicated by the PTBS legislation. Even assuming that the photograph evinced some form of subliminal racial expression—an assumption that we do not necessarily accept—such an expression would not fall within the proscription of Canon 7(B)(1)(d).[13] *Milkovich, supra*, at 13.

---

[12] Because of the specific language of subsection 752(3), it is unnecessary to determine whether respondent's statements might still fall outside the scope of Canon 7(B)(1)(d) on the ground that the details of the administrative arrangements under the PTBS statute should not obscure the larger truth that tax revenues are flowing out of district A (Warren and Center Line) and into district B (Detroit). Presumably, if this inflow and outflow did not balance in any of the legislatively created "regions," such regions would be adjusted in order that this occur. By this view, the gravamen of the statute is that it is essentially a "zero-sum" game in which benefits derived from one district must necessarily be compensated for by costs incurred by another.

[13] This, of course, does not mean that expressions of racial bias are to be tolerated among members of the judiciary. There can be little doubt that expressions or attitudes of racism implicate the "fair administration of justice" and are proscribed by Canon 2 of the Code of Judicial Conduct, which, in pertinent part, states:

> (B) A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should

Lastly, the JTC contends that respondent's use of the word "stole" in exhibit 1 falsely conveyed to the electorate criminal behavior on the part of Coleman Young. Again, we respectfully disagree. The word "stole" in respondent's communication did not reasonably communicate a statement of fact concerning criminal activity. Instead, it was merely a colloquial reference unquestionably, in our judgment, understood by readers in the context of a political brochure. It was, in the language of *Milkovich, supra* at 17-20, "rhetorical hyperbole." Viewing the word in context suggests that respondent chose the word to summarize the effect of the PTBS legislation. The task was obviously to convey the view that this legislation would redistribute school funds from one district to another. This is the language of the rough-and-tumble world of politics. It is core political speech. It is consumed by an often skeptical and wary electorate and it does not, in our judgment, fairly implicate the proscriptions set forth in Canon 7(B)(1)(d).[14]

---

treat every person fairly, with courtesy and respect.

* * *

(E) . . . A judge should be particularly cautious with regard to membership activities that discriminate, or appear to discriminate, on the basis of race, gender, or other protected personal characteristic.

[14] The dissenting opinion finds that, although the word "stole" communicated mere hyperbole, "it nonetheless refers to a completed act, not a potential act that depended on a chain of contingencies . . . ." Slip Op at 2-3. For the reasons that we have set forth, we respectfully disagree. We see nothing in the tense used by respondent that implicates the

24

Because exhibit 1 does not convey a false communication, it is unnecessary to determine whether respondent's communication was supported by reasonable facts. *Chmura I, supra* at 544.

### B. EXHIBIT 3

> Exhibit 3 is a one-page circular, folded in half, entitled "It didn't have to be this way." The cover contains a photograph of a partially obscured police officer in a patrol car. The inside of the flier contains a depiction of a mug shot with the caption "Murder . . . Rape . . . Dismemberment . . . Innocent Victims . . . Could Jim Conrad's Court have stopped it?" The accompanying text states that James Craig Cristini had appeared at least four times in 37th District Court during Conrad's tenure as court administrator and magistrate and had "received only a slap on the wrist" each time. It states that Cristini was "let back out for only $100" after being charged with assault and battery. The flier further states that "after being released on a second Assault and Battery charge, Cristini went on a rampage of murder and mayhem," resulting in "[i]nnocent victims, raped, murdered and dismembered." The text concludes with the following: "That's what happens when you put bureaucrats in charge of a court. Jim Conrad . . . He's just a bureaucrat." The back of the circular contains the text "End the Fear." [*Chmura I, supra* at 520-521]

With regard to exhibit 3, the JTC determined that respondent's communication swept too broadly by falsely attaching blame to James Conrad for certain decisions made by 37th District Court judges—specifically, that Conrad was responsible for releasing criminal defendant James Craig Cristini numerous times after imposing only minor punishments. Although we agree with the JTC that this statement could be interpreted as communicating that Conrad was specifically

canon at issue.

25

responsible (when he was not) for the subsequent crimes committed by Cristini, the brochure nevertheless is also subject to a more benign interpretation.[15]

It is often the case that affiliation is described by a possessive construction. In describing an institution as "John Doe's," one interpretation might be that John Doe is in charge of, and responsible for, that institution; an alternative interpretation might be that John Doe is merely associated in some manner with the institution. The JTC determined that the rhetorical question "could Jim Conrad's Court have stopped it?" could only mean that Conrad himself was the individual responsible for the judicial decisions made in the Cristini matter. We agree that such a reference would be false. However, an alternative interpretation is that respondent's rhetoric was merely to communicate Conrad's significant association with a court which, in respondent's judgment, had conducted itself irresponsibly in its dealings with Cristini. As court administrator, Conrad had significant administrative duties within the court and was an integral part of its day-to-day operations. Indeed, respondent's political message was, in essence, a response to what was the primary political thrust of the Conrad candidacy, namely, that Conrad as court administrator and magistrate, had significant

---

[15] Whether respondent specifically intended to mislead or not when he made this communication is not dispositive to the analysis under Canon 7(B)(1)(d). The canon does not proscribe a judicial candidate's use of a communication that is merely misleading. *Chmura I, supra* at 541. Rather, the canon only proscribes a judicial candidate's use or participation in the use of a communication that can only be viewed as false.

administrative and quasi-judicial duties within the 37th District Court that would recommend his promotion to judge.[16] By this understanding, it was not altogether inaccurate to refer to the court as "Jim Conrad's Court." As it is the case, as earlier discussed, when a statement is found to have a potentially non-false interpretation, the inquiry under Canon 7(B)(1)(d) must end.

Next, the advertisement stated "James Craig Cristini appeared in the 37th District Court at least 4 times while Jim Conrad was Court Administrator and Magistrate. Each time, he received only a slap on the wrist." A review of the evidence showed that at the time of the 1996 election, Cristini did appear in the 37th District Court numerous times on various misdemeanor and felony charges including disturbing the public peace, disorderly intoxication, and assault and battery charges. When Cristini's disturbance of the public peace and

---

[16] Conrad's literature primarily focused on the substantial length of time that he had been a magistrate, as well as on his record in the area of law enforcement. To emphasize this latter record, Conrad highlighted numerous cases where a defendant's bond had been set by him at $50,000 or higher. For example, one advertisement identified six separate such instances and stated in part "$100,000 cash bond on a person arrested for assault with intention to murder;" "$250,000 cash bond on a person arrested with intention to rob with a firearm;" "$50,000 cash bond on a person arrested for assault with intention to murder;" "$100,000 cash bond on a person arrested for armed robbery;" "$100,000 cash bond on a person arrested for delivery of heroin, assault with deadly weapon and fleeing police; "$100,000 cash bond on a person arrested for operating under the influence of liquor causing death and incapacitation injury." On the basis of such advertising, it was not altogether unexpected that respondent would reply with communications that characterized Conrad's close association with the district court in a less positive light.

disorderly intoxication charges proceeded to trial, the court approved the dismissal of the former charge in exchange for Cristini's plea of guilty to the latter charge. Cristini was sentenced to seventy-five days in jail and $200 in costs and fines. With regard to Cristini's assault and battery charge, his bond was set at $100. Additionally, the statement accurately communicated that James Conrad was a court administrator and magistrate when Cristini appeared in the 37th District Court; the statement did not indicate that Cristini personally appeared before Conrad. In light of this history, we find that the communication did not relate a false statement of fact.

The JTC also found that respondent improperly referenced that Cristini was "let back out for only $100" by Conrad after Cristini was charged with assault and battery. According to the JTC, Conrad did not preside over this case, and Cristini was released pursuant to an interim bond. Unlike the JTC, we find that this communication did not contain a false statement of fact. A review of the 37th District Court Criminal Case Inquiry revealed that on September 5, 1993, Cristini was charged with assault and battery, and a $100 bond was set. The fact that the advertisement failed to set forth the particulars of the bond is of no consequence as long as the statement was literally true. Further, the advertisement does not specifically name Conrad as the person who released Cristini. Thus, we conclude that this communication does not make a false statement of fact. *Masson, supra* at 496.

Because exhibit 3 does not convey a false communication,

28

it is unnecessary to determine whether respondent's communication was supported by reasonable facts.  *Chmura I, supra* at 544.

## C.  Exhibit 4

Exhibit 4 is a two-page flier entitled "We shouldn't have to worry about sexual harassment at work or violence at home!"  The cover of the flier contains a photograph of a young woman sitting at a typewriter with a male hand touching her shoulder and a photo of a [bruised] young woman with a young girl.  The upper half of the inside of the flier is captioned "Magistrate Jim Conrad is facing trial for sexual harassment of a female court employee!"  It includes a photograph of Conrad with a woman identified as a "former court reporter" leaning on his shoulder.  The woman's face is obscured.  Also included is a reduced image of a pleading described as a "Sexual Harassment complaint filed against Magistrate Jim Conrad."  The text states "Conrad tries to dodge trial by claiming 'government immunity.'" It explains in smaller type that Conrad "is accused of intimidating and firing a female court employee because she complained of being sexually harassed on the job.  Papers filed with the court by Conrad's lawyers say that he can't be tried because, as Magistrate, he has governmental immunity!"  It further states that the complaint had cost Warren and Center Line taxpayers "thousands of tax $$$ to defend!  Now, he wants your vote for District Court judge!"

The bottom half of the inside of the flier is entitled "Judge John Chmura . . . . One Tough Judge" and contains two photographs of him on the bench, one of which shows him exchanging papers with Macomb County Prosecutor Carl Marlinga.  The text states "Tough on domestic violence and stalkers!"  It explains that respondent is "tough on criminals who prey on women" and "won't stand for acts of domestic violence or allow stalkers to run wild."  It further states that respondent "won't tolerate sexual harassment of court employees," explaining that respondent "thinks your peace of mind comes first!"  The bottom half of the flier also includes a favorable quote about respondent from Prosecutor Marlinga.  The back of the flier contains a photograph of respondent with his family, a list of professional and civic affiliations, and a list of ten endorsers.  The

29

text also describes respondent as "one tough judge." [*Chmura I, supra* at 521-522]

With regard to exhibit 4, the JTC concluded that respondent falsely communicated that James Conrad was charged with sexual harassment. The JTC noted that at the time the communication was disseminated, the sexual harassment charge was no longer viable because it was dismissed pursuant to a summary disposition hearing. We respectfully disagree. On May 28, 1993, Carrie Meyer, the sexual harassment complainant, filed a complaint against James Conrad and others alleging, among other things, sex discrimination and sexual harassment. And while it is true that the sexual harassment count was eventually dismissed pursuant to summary disposition, other claims remained that included the sexual harassment allegations. One such claim was Meyer's retaliatory discharge claim. A review of the complaint revealed that this claim incorporated by reference the pertinent paragraphs of the sexual harassment claim, in essence, paragraphs 28-32. Paragraphs 28-32 asserted that Conrad owed a duty not to discriminate against the complainant because of her sex and that, despite this duty, Conrad had engaged in numerous instances of sex discrimination and harassment.

Next, the JTC determined that respondent falsely conveyed the nature of the sexual harassment engaged in by Conrad. The JTC determined that, when one viewed the totality of the advertisement, including the pictures and captions, the advertisement falsely communicated that Conrad was facing potential sexual harassment charges involving unwanted

30

physical contact.  We again respectfully disagree.  The front page of exhibit 4 stated that the Warren and Center Line electorate "shouldn't have to worry about sexual harassment at work and violence at home."  This text was accompanied by two photographs.  One photograph shows a young woman sitting at a typewriter with a male hand touching her shoulder and the other photograph shows a bruised woman with a young child.  We believe that the photographs were used as a visual tool to convey to a layman respondent's positions against sexual harassment and domestic violence, and could not lead a reasonable person to conclude that the circumstances shown in the sexual harassment photograph were reflective of the circumstances of James Conrad's particular sexual harassment suit.

The JTC next found that exhibit 4 falsely communicated that James Conrad was accused of firing Meyer after she complained about the sexual harassment at work.  The JTC found that Conrad, as a court administrator and magistrate, possessed no authority to fire court personnel and instead found that Meyer was fired by the 37th District Court judges.  Although it is true that Conrad, as a court administrator and magistrate, did not have the authority to hire or fire court employees, Meyer, in her complaint, asserted that Conrad *did* fire her.  In pertinent part, the complainant asserted that defendants, including Conrad, had discriminated against her and that, on the basis of this discrimination, she suffered numerous injuries including loss of employment.  Therefore, respondent did not inaccurately communicate that James Conrad

was accused of firing a female court employee.

Finally, the JTC found that respondent improperly used a photograph of Lisa Burgor, a freelance court reporter, to falsely represent Meyer. Moreover, they concluded that the caption under Burgor's photograph falsely stated that she was a former court reporter. The photograph at issue showed Conrad with a woman whose face is concealed. Below the photograph, it reads: "Magistrate Jim Conrad with a former court reporter." This is not false. Lisa Burgor testified that she was a free-lance court reporter at the time the photograph was taken and that she had appeared in the 37th District Court numerous times. Nowhere does respondent claim that the individual in the photo was complainant. Further, we find that the reference to Burgor as a former court reporter is not false. As stated above, Burgor testified that she had appeared in the 37th District Court numerous times as a free-lance court reporter. Thus, respondent correctly described the woman as "former court reporter."

Because exhibit 4 does not convey a false communication, it is unnecessary to determine whether respondent's communication was supported by reasonable facts. *Chmura I, supra* at 544.

### D.  EXHIBIT 5

Exhibit 5 is a one-page circular, folded in half, that includes a drawing on its cover of a man leaving a courthouse asking the question "Where is my Courtroom?" The left half of the inside of the flier contains the "answer": "Jim Conrad is not a Judge, he has no courtroom."

The right half of the inside of the flier is captioned "So what has Jim Conrad been doing as

32

Court Administrator for the past 7 years?" The text below the question states "Murders and Stalkers . . . , back on the streets . . . commit crimes again . . ." It explains: "In case after case . . . Murderer James Craig Cristini . . . Stalker Edward Lightfoot . . . Hardened, violent criminals appeared in the 37th District Court again and again only to be let out to commit more crimes." Under the heading "Corruption and Inefficiency," the flier states that federal investigators were looking into charges that the 37th District Court Probation Department "was running a scam under which court employees were receiving kickbacks, making big money off people's misery."

Under the heading "Sued for Sexual Harassment," the text states that "[w]hen court employee Carrie Meyer complained about the way she was treated at work, Jim Conrad threatened her job, demoted her, and harassed her." It further states that "Conrad's actions have resulted in a major sexual harassment lawsuit which has cost Warren and Center Line thousands to defend. But what's Conrad's defense? That he shouldn't be prosecuted because of government immunity." The text concludes with the statement "That's what happens when you put bureaucrats in charge of a court. Jim Conrad. . . He's just a bureaucrat." The text on the back of the flier states "No More Bureaucrats." [*Chmura I, supra*, at 522-523]

The JTC concluded that exhibit 5 falsely suggested that James Conrad was responsible for felonies committed by criminal defendants James Craig Cristini and Edward Lightfoot after these two individuals had appeared in the 37th District Court on misdemeanor charges, when in fact Conrad had limited involvement with each of these individuals. The communication, in pertinent part, stated that "[i]n case after case . . . Murderer James Craig Cristini . . . Stalker Edward Lightfoot . . . Hardened, violent criminals appeared in the 37th District Court again and again only to be let out to commit more crimes." As discussed previously in exhibit 3,

33

the evidence demonstrated that Cristini was charged and convicted of numerous misdemeanors and felonies and was subsequently released after arguably modest penalties were imposed upon him. Court documents then identify that, shortly thereafter, Cristini was charged with open murder. Additionally, court documents indicate that Edward Lightfoot had been charged with making a telephone call with the intent to "terrorize, frighten, intimidate, threaten, harass, molest, annoy, or disturb the peace and quiet" of a complainant in violation of MCL 750.540e(1)(e); MSA 28.808(5). Bond was set by James Conrad in the amount of $3,500. At the time Lightfoot's bond was set for $3,500, he had been previously charged with several misdemeanors in the 37th District Court. In light of this record, we find that respondent's statement that Cristini and Lightfoot "appeared in the 37th District Court again and again only to be let out to commit more crimes" was not false.

The JTC also contends that exhibit 5 falsely communicated that numerous 37th District Court probation department employees were being investigated for allegedly illegal activities. Specifically, the JTC determined that the investigation extended to only one employee and not to numerous employees as stated in the advertisement. In pertinent part, the communication states that "[f]ederal officers are looking into charges that the 37th District Court Probation department was running a scam under which court employees were receiving kickbacks, making big money off people's misery." A review of the record shows that the

34

statement was inaccurate. The record reveals that the investigation of the 37th District Court Probation Department involved a single individual, Orba Underwood. However, this inaccuracy does make the substance of the communication false. *Masson, supra* at 517. The "substance" or "gist" of the statement was to communicate the fact of the investigation of the 37th District Court probation department, including the allegedly illegal activities that had occurred within the department. The fact that the communication inaccurately stated that the investigation involved multiple employees does not, in our judgment, alter the substance of what respondent communicated. We believe that if the communication had correctly identified that the investigation involved only one individual, the effect on the mind of the reader would be no different—the "gist" of the communication would still be that the probation department was being investigated for allegedly illegal activities. Thus, the communication is not false for purposes of Canon 7(B)(1)(d).

Finally, the JTC expressed that the statement concerning the probation investigation falsely held Conrad responsible for the allegedly illegal activities of the probation department. We disagree. Nowhere does the communication cite James Conrad as the person responsible for the allegedly illegal activity. The advertisement merely highlighted that there was an investigation of the department, and set forth the specific allegations, in essence, that illegal "kickbacks" were involved.

Because exhibit 5 does not convey a false communication,

35

it is unnecessary to determine whether respondent's communication was supported by reasonable facts. *Chmura I, supra* at 544.

## V. CONCLUSION

The Code of Judicial Conduct, Canon 7 (B)(1)(d), states that a judicial candidate "should not knowingly, or with reckless disregard, use or participate in the use of any form of public communication that is false." When analyzing whether a judicial candidate has violated the canon, we conclude that the communication at issue must have conveyed an objectively factual matter. Thus, speech that can be reasonably interpreted as communicating hyperbole, epithet, or parody is protected, at least under Canon 7(B)(1)(d). Similarly, an expression of opinion is protected under the canon as long as it does not contain provably false factual connotations. If the communication at issue sets forth objectively factual matters, the communication must then be analyzed to determine whether the statements communicated are literally true. If they are, the judicial candidate will not be in violation of Canon 7(B)(1)(d). However, if the public communication conveys an inaccurate statement, the communication, as a whole, must be analyzed to determine whether the "the substance, the gist, the sting" of the communication is true despite such inaccuracy. Once it has been determined that a judicial candidate has, in fact, made a false public communication, the inquiry then focuses on whether such communication was made knowingly or with reckless disregard.

36

Pursuant to the above rules regarding false communications, we conclude that respondent did not violate Canon 7(B)(1)(d). A review of the four exhibits reveal that the communications were either literally true, substantially true despite their inaccuracies, or communicated mere rhetorical hyperbole. Thus, we reject the JTC's recommendation to suspend respondent from all judicial activities without pay for a period of ninety days. MCR 9.225.

Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.

CORRIGAN, C.J., and WEAVER, TAYLOR, and YOUNG, JJ., concurred with MARKMAN, J.

# STATE OF MICHIGAN

## SUPREME COURT

*In re* JOHN M. CHMURA (AFTER REMAND),
Judge of the Thirty-Seventh District Court,
Warren, Michigan.                                    No. 117565
_____

CAVANAGH, J. (dissenting).

Though I do not disagree with the majority's articulation of the standard for falsity under Canon 7(B)(1)(d) and its application of that standard to exhibits 3, 4, and 5, I disagree with the application to exhibit 1 in this case. Because I believe that exhibit 1 conveys a false communication, I would impose some level of discipline on respondent. I, therefore, must respectfully dissent.

Among other matters, exhibit 1 advertised respondent's role in challenging property tax base sharing legislation. Respondent stated that the legislation "stole from our taxpayers, our schools and our children to help prop up Coleman Young," and stated that, in the course of "standing up for your children," he took "the state to court, arguing one appeal after another, until the state backed down and allowed your kids to benefit from your hard-earned tax dollars."[1] The Judicial Tenure Commission concluded that this exhibit falsely communicated that respondent had "prevented Coleman Young and

---

[1] See slip op at 22-23 for a full description of exhibit one.

others from taking tax dollars from Warren and Center Line property owners to spend on the Detroit school system." In contrast with the majority, I agree.

As the majority opinion explains, Warren and Center Line were placed in region 1 under the tax legislation, and Detroit was placed in region 2. See slip op at 24. Because the legislation provided that school districts would only share revenue with other districts within the same region, tax revenue from Warren and Center Line could not actually have been directed to Detroit. The majority concludes that respondent's statement that he prevented Warren and Center Line's tax revenue from being directed to Detroit is nevertheless not false because the overall legislative scheme provided that if several contingencies had arisen, Warren and Center Line's tax revenues could have been directed to Detroit. See *id*. at 24-25; see also MCL 380.752(3); MSA 15.4752(3), repealed 1993 PA 175.

That conclusion, however, does not consider what respondent actually communicated. Importantly, in exhibit 1 respondent stated that Coleman Young and his supporters "*stole from our taxpayers*" to "help prop up Coleman Young." Though I take no issue with respondent's hyperbolic use of the term "stole," it nonetheless refers to a completed act, not a potential act that depended on a chain of contingencies, as the majority concludes.[2] Here, respondent did not state that

_____

[2] As the majority states, respondent used "stole" to colorfully describe the effect of the legislation. See slip
(continued...)

2

the legislation "would steal," "could steal," or "was going to steal" Warren and Center Line's tax revenue. Instead, by stating that the legislation "stole" from Warren and Center Line, respondent communicated that the perceived wrong had already been perpetrated. Further, he communicated that the lawsuit he handled corrected that wrong when "the state backed down." Because of the statutory region classifications, though, revenue from Warren and Center Line had not, and could not have, gone to Detroit. By communicating that he brought a lawsuit that prevented Detroit from receiving tax revenue that had been stolen to benefit Detroit, then, respondent conveyed an "inaccurate statement," that is, a false communication.

With that false communication, the analysis must proceed to step two, which considers whether the gist, substance, or sting of the communication is true despite the factual inaccuracy. That is, the analysis must consider whether the inaccuracy "alters the complexion of the affair, and would have no different effect on the reader than that which the literal truth would produce . . . ." *Rouch v Enquirer & News of Battle Creek (After Remand),* 440 Mich 238, 259; 487 NW2d 205 (1992), quoting *McAllister v Detroit Free Press Co,* 85

---

[2](...continued)
op at 30. "Colorfully" also euphemistically describes the racial overtones this flier intended to convey. However, had respondent used a less inflammatory phrase, perhaps saying that the legislation "appropriated revenue from" or "redistributed money from" Warren and Center Line to Detroit, this point would nevertheless remain true. The focus is not the connotation of the term respondent used to describe the act, but that the term he used described a completed act rather than a pending act.

Mich 453, 461; 48 NW2d 612 (1891); see also slip op at 17-19.

For largely the same reasons that the communication was false, the gist, sting, and substance of the communication is also false. Respondent stated that "Coleman Young and the Lansing crowd" completed an act-they "stole" from Warren and Center Line-and that respondent handled a lawsuit, the result of which was that they "backed down and allowed your kids to benefit from your hard-earned tax dollars." The literal truth, however, is that when respondent was handling the lawsuit he referenced, no revenue had been, and no revenue could be, directed from Warren and Center Line to Detroit. This literal truth would have a different effect on the reader than respondent's inaccurate statement. The effect of the literal truth was that respondent was counsel on a case challenging legislation that, at most, might have sent revenue from Warren and Center Line to Detroit if certain facts had come to be, but was not sending any revenue from Warren and Center Line to Detroit. On the other hand, the effect of respondent's inaccurate statement was that the legislation "stole" from Warren and Center Line, sent the revenue to Detroit to "prop up" its mayor, and that the suit respondent handled was necessary to force the state to back down and allow school children in Warren and Center Line to benefit from those cities' tax dollars and stop sending those tax dollars to Detroit. Because the pleaded truth would have had a different effect on the mind of the reader than the inaccurate statement, the statement was not substantially true, and therefore violated Canon 7(B)(1)(d).

4

This violation of the Canon provides a basis for imposing discipline on respondent. Recently, this Court set forth a nonexhaustive list of factors that should be applied when determining the sanction for judicial misconduct. See *In re Brown,* 461 Mich 1291, 1292-93 (2000). However, absent a majority favoring disciplining respondent, an analysis of those factors would have no effect in this case, so I will refrain from discussing them. Suffice it to say that I conclude that respondent has violated Canon 7(B)(1)(d). I, therefore, respectfully dissent.

KELLY, J., concurred with CAVANAGH, J.