CORRIGAN, J.
(concurring in part and dissenting in part). In this defamation action, we consider whether the Court of Appeals erred by determining that plaintiff Derith Smith, a public official, failed to present clear and convincing evidence to support a finding of actual malice at trial. I concur with the majority that plaintiff did not satisfy her evidentiary burden regarding defendant Noel Flohe. I dissent, however, from the majority’s conclusion that plaintiff presented clear and convincing evidence that defendants John Stanek and Donald Barrows acted with actual malice when they mailed copies of a public record — a report critical of plaintiffs job performance written by her former supervisor, Suttons Bay Village Manager Charles Stewart (the Stewart report). I would affirm the result reached by the Court *132 of Appeals concerning each of the three individual defendants because my independent review of the record reveals that plaintiff failed to present clear and convincing evidence that Stanek and Barrows acted with actual malice.
I. ACTUAL MALICE STANDARD
As the majority explains, to prevail in a defamation action, a plaintiff who is a public official must establish that a defendant made a false and defamatory statement with “actual malice.”[1] “ ‘Actual malice’ exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth.”[2] The Legislature codified the heightened actual malice standard in MCL 600.2911(6), which mandates that a plaintiff who is a public official sustain a defamation claim “by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.”[3] Clear and convincing proof is
evidence that “produce [s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct, and weighty and convincing as to enable [the factfinder] to *133 come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. ”[4]
Application of the heightened actual malice standard in cases involving political speech reflects our “profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.” [5] This Court has distinguished between regulation of political speech and commercial speech, stating:
Political speech is “ ‘at the core of our electoral process and of the First Amendment freedoms’ ... an area of public policy where protection of robust discussion is at its zenith.” Because the central purpose of the First Amendment speech clause is to protect core political speech, we determined that political speech may not be regulated in the same manner that commercial speech is regulated.[6]
“There is little doubt that ‘public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the New York Times rule/ and the strongest possible case for independent review” of the actual malice determination.[7]
When determining whether a public official plaintiff has satisfied the heightened actual malice stan *134 dard, “the reviewing court must consider the factual record in full.”[8] The requirement of independent review “assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge.”[9] In Locricchio v Evening News Ass’n, this Court observed that the independent review requirement “reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context.”[10] One year after Locricchio, this Court expanded its discussion about the importance of independent review, stating that “[w]e perceive an additional need for independent review grounded on the fear that juries may give short shrift to important First Amendment rights.” [11]
In New York Times Co v Sullivan, the United States Supreme Court recognized that “erroneous statement^] [are] inevitable in free debate, and that [these statements] must be protected if the freedoms of expression are to have the ‘breathing space’ that they *135 ‘need... to survive.’ ”[12] Absent such protection, “would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so.”[13] That is, not protecting false defamatory statements would “dampenG the vigor and limit[] the variety of public debate.”[14] Because such an outcome cannot be tolerated under the First Amendment, “neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct. . . .”[15] Instead, a plaintiff who is a public official must establish actual malice before recovering damages for a defamatory falsehood.[16]
The matters at issue here lie at the heart of our political discourse and are subject to the expansive protections enshrined in the First Amendment.[17] Nonetheless, the majority imposes liability on two of the three individual defendants because they failed to personally investigate information criticizing a political opponent contained in a public record. In so doing, the *136 majority punishes defendants’ exercise of their First Amendment rights to engage in political speech and to distribute a public record, contrary to well-established United States Supreme Court precedent.[18] Moreover, the majority shirks its “constitutional responsibility” to independently review the whole factual record,[19] and the majority also wrongly defers to the jury’s verdict when such deference is not owed.[20]
II. ACTUAL MALICE STANDARD AS APPLIED
In this case, all three individual defendants were politically active residents of Elmwood Township. Stanek, a township trustee from 1998 to 2004, survived a 2003 recall campaign in which plaintiff was involved. He lost his bid for reelection in 2004, and his slate was replaced by a group of candidates that included plaintiff. Flohe was the township supervisor until plaintiff was elected to replace him in 2004. Barrows, another political opponent of plaintiffs, expressed his concern that plaintiffs job performance in Elmwood Township would be similar to her previous tenure as clerk in the village of Suttons Bay. He sought information about *137 plaintiffs track record in the village from Jerry VanHuystee, Suttons Bay’s appointed treasurer. VanHuystee furnished Barrows with the publicly available Stewart report, which criticized plaintiffs job performance in the village. Indeed, the Stewart report caused plaintiffs termination from her position in the village. Defendants subsequently mailed approximately 450 copies of the Stewart report to local residents, local government officials, and plaintiff. Before defendants mailed the Stewart report, someone had modified it with a handwritten caption stating “Attention: Suttons Bay Villagers Alledged [sic] Misuse of Village Taxpayer Funds?” and “Derrick [sic] Smith.”
Plaintiff received a copy of the Stewart report on May 17, 2005, and filed suit in July 2005. Plaintiffs suit proceeded to trial, and the jury returned a verdict in favor of plaintiff. The jury ordered that Stanek pay plaintiff $40,000 in noneconomic damages and $4,000 in campaign expenses and that Barrows pay plaintiff $45,000 in noneconomic damages and $4,000 in campaign expenses. By contrast, the jury only assessed $10,000 in noneconomic damages and $4,000 in campaign expenses against Flohe. However, the jury also mandated that each individual defendant publish a public apology to plaintiff in the form of a legal notice to appear in two local newspapers: the Traverse City Record-Eagle and the Leelanau Enterprise.
Although I generally agree with the majority’s explication of the actual malice standard, I disagree with the majority’s application of that standard to defendants Stanek and Barrows on this record. The record does not show “with convincing clarity”[21] that defendants acted *138 with actual malice when they mailed the Stewart report. The “clear and convincing” evidentiary standard requires that plaintiff satisfy “the most demanding standard applied in civil cases.”[22] After performing an independent review of the record, I cannot conclude that plaintiff satisfied this exacting standard. While plaintiff proffered some evidence of actual malice, that evidence is not “so clear, direct. . . weighty and convincing” that I can unhesitatingly state that either Stanek or Barrows acted with actual malice when they disseminated the Stewart report.[23]
Suttons Bay Village Manager Charles Stewart, plaintiffs former supervisor, drafted the report about plaintiffs tenure with the village. Stewart addressed the report to the village’s personnel committee, which voted to terminate plaintiff after reviewing it. The Stewart report remained on file thereafter. In the report, Stewart stated that (a) the village hired plaintiff as an independent contractor, but plaintiff received benefits available to full-time employees although she had not received W-2 forms; (b) when the village council declined to reappoint plaintiff as clerk, she delayed responding to the village’s part-time job offer until Stewart was away from the office, at which time plaintiff directly contacted the council president without Stewart’s knowledge to authorize a higher pay rate; (c) plaintiff did not exert more than the minimum effort necessary to perform her job; and (d) plaintiff was not a “team player.”
At trial, Stewart acknowledged that the report contained misinformation. For example, Stewart eventually located plaintiffs W-2 forms, which confirmed her status as an employee, rather than an independent contractor. However, Stewart testified that other aspects *139 of the report were true, including his belief that plaintiff took purposeful steps to avoid a reduction in pay by directly contacting the council president in Stewart’s absence. Plaintiff did not dispute the basic facts involving her pay rate as described in the Stewart report. Nor did she dispute the specific facts surrounding the statements in the Stewart report that Stewart continued to maintain were true. Rather, plaintiff testified that she did not intend to circumvent efforts to lower her pay rate by directly contacting the council president in Stewart’s absence. In its decision regarding defendants’ motions for summary disposition, the trial court held that “[t]he Stewart report was not a disciplinary report, was not required to be destroyed, and was subject to disclosure under FOIA [the Freedom of Information Act].” Plaintiff never appealed this adverse ruling.
A. DEFENDANT JOHN STANEK
Plaintiff did not present clear and convincing evidence that defendant Stanek acted with actual malice. The testimony of retired police officer George Preston does not establish with convincing clarity that Stanek knew that the Stewart report contained defamatory falsities when he mailed it. Nor does Preston’s testimony show that Stanek recklessly disregarded its truth or falsity, i.e., that he “entertained serious doubts as to the truth”[24] of the Stewart report or mailed the Stewart report despite having a “high degree of awareness of [its] probable falsity.”[25]
*140 Preston testified that he attended an informal gathering of 10 or 12 people at Stanek’s shop in early May 2005 “where some neighbors got together and were talking about current issues going on in Elmwood Township.” At this gathering, copies of the Stewart report were distributed, and the attendees began discussing it. When Preston saw a copy of the Stewart report, he “became kind of interested, being a [retired] police officer.” Preston volunteered to contact Suttons Bay Village Manager Charles Stewart and ask Stewart about “the contents of this information.”[26] Preston wanted “to ensure that [Stewart] did type this and the information inside is what [Stewart] had put in.” Preston testified that he waited a “[m]inimum [of] two weeks before I even talked to [Stewart] on the telephone.” He also testified that Stewart never told him that the report contained falsities. As a result, Preston never told anyone else, including Stanek, that the Stewart report contained falsities.[27] Instead, Preston told Stanek that the Stewart report had “no substance *141 to it as far as the criminal aspect.” Preston also informed Stanek that because there had been no criminal investigation, he personally “felt that it wasn’t right to send that [report] out.” Preston testified that he conveyed this message to Stanek at a monthly Elmwood Township meeting that occurred in “late spring, so that’s May, June,” but Preston did not recall the exact date of this conversation.[28]
Preston’s testimony certainly does not establish with convincing clarity that Stanek acted with actual malice in disseminating the Stewart report. Although Preston told Stanek that the Stewart report had no substance “as far as the criminal aspect,” Preston unambiguously testified that he never told Stanek or anyone else that the Stewart report contained falsities.[29] Stewart con *142 firmed that he “did not specify” to Preston what misinformation appeared in the report. Stewart also testified that he never spoke with Stanek about the report and that he never attempted to inform Stanek that the report contained falsities. The majority emphasizes Preston’s concern with the “criminal aspect” of the Stewart report. However, the Stewart report does not address whether plaintiff engaged in criminal activity or should be criminally prosecuted. The five-page Stewart report does not contain the words “crime” or “criminal.” Stewart testified that the report discussed perceived ethical violations by plaintiff. When asked whether he asserted that plaintiff had engaged in illegal conduct in the report, Stewart testified, “I don’t believe that’s even in the memo.” In any event, Preston never told Stanek that the Stewart report contained falsities or that the veracity of the Stewart report had been called into question. Instead, Preston informed Stanek of his personal opinion about the “criminal aspect” of the Stewart report. Preston’s act of volunteering to contact Stewart and later sharing his personal opinion about the Stewart report with Stanek does not supply clear and convincing evidence that Stanek mailed the Stewart report with actual malice, i.e., either knowing the report contained defamatory falsities or recklessly disregarding its falsity.
Moreover, the testimony concerning the timeline of events is anything but clear and convincing. The majority deduces that the conversation between Preston and Stanek occurred at the monthly Elmwood Township meeting on May 9, 2005, and not the monthly Elmwood Township meeting on June 13, 2005. The majority reasons that because Preston spoke to Stanek *143 on May 9, or before he mailed the Stewart report, Stanek mailed the Stewart report knowing that it contained defamatory falsities. Yet, Stanek testified with a firm recollection that this conversation occurred on June 13. Preston had no clear recollection of the date. But neither Preston nor Stanek testified in a manner that comports with the majority’s dubious conclusion that the two men spoke on May 9 — before the Stewart report was mailed.
It is undisputed that the informal gathering at Stanek’s shop occurred during the first week of May 2005 and that plaintiff received the Stewart report in the mail on May 17, 2005. Several witnesses testified that the informal gathering at Stanek’s shop occurred on May 2 or May 4. Preston testified that he waited a minimum of two weeks after the gathering before contacting Stewart. Preston further testified that after his telephone conversation with Stewart, he approached Stanek some time in “late spring, so that’s May, June.”[30] Thus, the earliest week in which Preston could have telephoned Stewart is the third week of May 2005 — one week after the Elmwood Township meeting on May 9, 2005. That is, under Preston’s timeline of events, Preston telephoned Stewart no earlier than May 16 or May 18, 2005, and Preston shared his personal opinion with Stanek some time thereafter. Consequently, Preston’s testimony actually corroborates Stanek’s recollection that the conversation took place on June 13, 2005. If the conversation between Preston and Stanek occurred on June 13, Preston did not speak to Stanek until after defendants disseminated the Stewart report, and there is no basis to conclude, as the majority summarily does, that Stanek knew that the *144 Stewart report contained defamatory falsities when he mailed it. The actual testimony on the record, and not the majority’s distortion of it, provides yet another basis to conclude that plaintiff did not present clear and convincing evidence that Stanek acted with actual malice.
The majority also accords great weight to Preston’s testimony that Stanek initially denied responsibility for the anonymous mailing. The majority’s misplaced reliance on Preston’s testimony about Stanek’s initial denial of responsibility ignores the United States Supreme Court’s observation that a defendant’s repeated attempts to maintain that the inaccurate was accurate “does not establish that he realized the inaccuracy at the time of publication.”[31] Stanek’s after-the-fact denial of responsibility for the mailing is irrelevant in determining whether plaintiff presented clear and convincing evidence that Stanek acted with actual malice when he mailed the Stewart report.
B. DEFENDANT DONALD BARROWS
I also reject the majority’s conclusion that plaintiff presented clear and convincing evidence that defendant Barrows acted with actual malice. The majority concedes that Barrows did not know that the Stewart report contained defamatory falsities at the time of its dissemination.[32] Therefore, the salient issue is whether *145 plaintiff presented sufficient evidence to support a finding that Barrows recklessly disregarded the truth or falsity of the Stewart report. My independent review of the record reveals that plaintiff did not establish with convincing clarity that Barrows mailed the Stewart report “with reckless disregard of whether or not it was false.”[33]
The majority relies on the testimony of Suttons Bay Village Treasurer Jerry VanHuystee to conclude that Barrows acted with actual malice. VanHuystee furnished the Stewart report to Barrows. However, VanHuystee’s testimony does not establish with convincing clarity that Barrows acted with reckless disregard in disseminating the Stewart report. VanHuystee testified that as the appointed village treasurer, he never supervised plaintiff; moreover, he was not in contact with anyone who did supervise plaintiff. As the majority notes, Barrows asked VanHuystee at least five times whether plaintiff had engaged in illegal conduct during her tenure with the village. VanHuystee repeatedly responded that “as far as I know [plaintiff] hadn’t done anything illegal,” but VanHuystee also specifically told Barrows that he had no idea.[34] VanHuystee also testified *146 that he did not even know that the Stewart report existed when he responded to Barrows’s questions about plaintiff. Significantly, VanHuystee never testified that he told Barrows that the Stewart report contained falsities or that it merited further investigation based on VanHuystee’s review of the document. To the contrary, VanHuystee testified that he only procured a copy of the Stewart report “to stop [Barrows] from asking me” about plaintiff. Additionally, no evidence explains why VanHuystee, a disinterested party, would furnish the Stewart report to Barrows if VanHuystee doubted its veracity. Consequently, I cannot conclude that VanHuystee’s testimony clearly established that Barrows mailed the Stewart report with reckless disregard of its falsity.
The majority’s reliance on Preston’s testimony to establish that Barrows mailed the Stewart report with actual malice is similarly misplaced. Barrows testified that he heard Preston say that he wanted to talk to Stewart during the informal gathering at Stanek’s shop, but Barrows also testified that he did not think he heard Preston say “don’t send the memo.” Preston further testified that the only defendant with whom he spoke after his conversation with Stewart was Stanek. He never spoke to Barrows. Moreover, Preston testified that he had no knowledge of any falsities in the Stewart report, and as a result, he never told anyone else, including Barrows, that the Stewart report contained falsities. Stewart confirmed that he, too, had no contact with Barrows about the report before the mailing. The majority’s reliance on Preston’s testimony is misplaced because nothing in Preston’s testimony demonstrates that Barrows “in fact entertained serious doubts as to *147 the truth of his publication”[35] or that Barrows mailed the Stewart report with the requisite “high degree of awareness of [its] probable falsity.”[36]
I also disagree with the majority’s perplexing assertion that Barrows’s testimony reveals his “purposeful avoidance of the truth” consistent with Harte-Hanks Communications, Inc v Connaughton, 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562 (1989). In Harte-Hanks, the United States Supreme Court concluded that “[although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.”[37] The majority suggests that Barrows purposefully avoided the truth because he did not contact Stewart directly. In so doing, the majority conflates Barrows’s failure to investigate with the “purposeful avoidance of the truth” illustrated by the unique facts in Harte-Hanks.
In Harte-Hanks, the defendant newspaper gathered the facts that were ultimately reported; drafted the offending statements; actually heard from the plaintiff himself and five other witnesses that the offending statements were untrue; failed to examine evidence in the defendant’s possession corroborating plaintiffs story; and opted not to contact the key witness in the story it was creating, although it contacted the other parties involved. As the Supreme Court explained, “[i]t is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson’s claims, yet chose not to interview the one witness who was most likely to confirm Thompson’s account of the events.”[38] “By the time the *148 November 1 story appeared, six witnesses had consistently and categorically denied Thompson’s allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events.”[39] In addition, the defendant newspaper had in its possession tapes that would have either verified or disproved its story and yet did not listen to these tapes before publishing its story.
In stark contrast to the defendants in Harte-Hanks, defendants here distributed a public record prepared by a government official in the course of his duties and available to the public under FOIA; defendants were never told by anyone that the contents of the report were untrue; they were not given any reason to believe that the contents of the report were untrue; and they did not fail to view evidence in their possession that indicated that the contents of the report were untrue. No evidence whatsoever reflects that Barrows entertained serious doubts about the veracity of the Stewart report before its publication or that he mailed the Stewart report with a high degree of awareness of its probable falsity. In fact, Barrows testified that he had no reason to investigate the Stewart report because he recognized that it came from a reliable source. When asked whether he would have treated the Stewart report differently if its origins appeared dubious, Barrows responded, “Certainly. You couldn’t pay any credence to it.” In this case, however, Barrows reiterated that “[t]he copy came to me through a reliable source, Mr. VanHuystee” and that “I had no doubt it was reliable.”
Finally, it is axiomatic that the mere failure to investigate before publication will not support a finding *149 of reckless disregard.[40] In the same fashion, the mere fact that Preston expressed his hesitance about mailing the Stewart report and chose to contact Stewart does not impose a similar requirement on Barrows because reckless disregard is “not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.”[41] Under these facts, plaintiff did not present clear and convincing evidence that Barrows either attempted to purposefully avoid the truth or that Barrows mailed the Stewart report in reckless disregard for its falsity.
III. CONCLUSION
After independently reviewing the record, I cannot conclude that plaintiff presented clear and convincing evidence that either Stanek or Barrows acted with actual malice in disseminating the Stewart report. There is no evidence that either defendant knew about the misinformation contained in the Stewart report regarding plaintiffs status as an employee, her W-2 forms, and her right to employee benefits when they mailed this public record. Accepting that Stanek and Barrows were political opponents who bore ill will toward plaintiff and knew that she had not been criminally prosecuted for any improprieties during her tenure in the village of Suttons Bay the record contains no evidence that either defendant entertained serious doubts about the truth of the Stewart report. Accordingly, I would affirm the result *150 reached by the Court of Appeals concerning each of the three individual defendants.
YOUNG and MArKMAN, JJ., concurred with CORRIGAN, J.

 New York Times Co v Sullivan, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964).

 J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1, 468 Mich 722, 731; 664 NW2d 728 (2003), citing New York Times, 376 US at 280.

 MCL 600.2911(6) provides:
An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

4 In re Chmura (After Remand), 464 Mich 58, 72; 626 NW2d 876 (2001), quoting In re Martin, 450 Mich 204, 227; 538 NW2d 399 (1995).

 New York Times, 376 US at 270.

6 In re Chmura (After Remand), 464 Mich at 65, quoting Meyer v Grant, 486 US 414, 425; 108 S Ct 1886; 100 L Ed 2d 425 (1988).

 Harte-Hanks Communications, Inc v Connaughton, 491 US 657, 686-687; 109 S Ct 2678; 105 L Ed 2d 562 (1989), quoting Ocala Star-Banner Co v Damron, 401 US 295, 300; 91 S Ct 628; 28 L Ed 2d 57 (1971).

 Harte-Hanks, 491 US at 688; see also Locricchio v Evening News Ass’n, 438 Mich 84, 110; 476 NW2d 112 (1991), quoting New York Times, 376 US at 285 (“[New York Times\ mandate[s] that reviewing courts ... ‘examine for [themselves] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment. .. protect.’ ”) (quotation marks omitted).

 Bose Corp v Consumers Union of United States, Inc, 466 US 485, 501; 104 S Ct 1949; 80 L Ed 2d 502 (1984).

 Locricchio, 438 Mich at 114 n 20.

 Rouch v Enquirer & News of Battle Creek (After Remand), 440 Mich 238, 258; 487 NW2d 205 (1992). Rouch further observed that “[e]ven Justice Rehnquist, who dissented in Bose, supra, conceded that the doctrine of independent review of facts ‘exists... so that perceived shortcomings of the trier of fact by way of bias or some other factor may be compensated for.’ ” Id., quoting Bose, 466 US at 518.

 New York Times, 376 US at 271-272, quoting NAACP v Button, 371 US 415, 433; 83 S Ct 328; 9 L Ed 2d 405 (1963).

 New York Times, 376 US at 279.

 Id.

 Id. at 273.

 Id. at 279-280.

 The constitutional right guaranteeing the freedom of speech is embodied explicitly in both the United States Constitution and the Michigan Constitution. US Const, Am I (“Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.”); Const 1963, art 1, § 5 (“Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.”).

 Harte-Hanks, 491 US 657; Bose, 466 US 485; New York Times, 376 US 254.

 Bose, 466 US at 501.

 The Locricchio Court explained:
It is worth noting in this connection that the doctrine of independent review reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context. Thus, “much of contemporary first amendment doctrine, theory, and commentary is devoted to protecting speech from the jury.... The common wisdom is that if juries were given more decisional power in [First Amendment cases], either by increasing the range of issues they could consider or by granting juries greater immunity from appellate review, free speech would suffer a crippling blow.” Schauer, The role of the people in First Amendment theory, 74 Cal L R 761, 765 (1986). [Locricchio, 438 Mich at 114 n 20.]

 See Bose, 466 US at 514 (“Appellate judges . .. must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.”).

 In re Martin, 450 Mich at 227.

 Id. (quotation marks and citations omitted).

 See St Amant v Thompson, 390 US 727, 731; 88 S Ct 1323; 20 L Ed 2d 262 (1968) (“There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.”).

 See Garrison v Louisiana, 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964) (stating that “only those false statements made with the high *140 degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions”).

 When asked whether the other attendees heard him volunteer, Preston responded, “Definitely, yes.” Barrows confirmed that he heard Preston say that he wanted to talk to Stewart, but Barrows did not think that he heard Preston make statements about not sending the report. By contrast, Stanek testified, “I did not hear [Preston] say he was going to talk to Mr. Stewart,” and Flohe testified that he also did not hear any talk about Preston contacting Stewart.

 Preston testified in pertinent part:
Q. You hadn’t received any information from Mr. Stewart that anything in the memo was false?
A. No, I did not.
Q. So you did not have any knowledge that anything in the memo was false, to convey to Mr. Stanek or anyone else, correct?
A. That’s correct.
*141 Q. And, in fact, when you pulled Mr. Stanek aside after this meeting, where he spoke at length, you did not tell him anything in the memo was false, correct?
A. That’s correct.

 At trial, Preston vacillated about when he spoke with Stanek. When asked whether the conversation took place during the monthly Elmwood Township meeting in May 2005, Preston responded, “I couldn’t tell you what month it is, but I know it was in late spring.” Preston later testified, “I don’t think it did go in the month of June. I think it was several weeks, so if that was May 2nd it would have probably been wdthin the month of May.”

 In response to another series of questions about his conversation with Stewart and his subsequent communication with others, Preston testified:
Q. Sure, exactly. But [Stewart] never told you there was anything false in that memo, did he?
A. He did not.
Q. As a consequence you never told anybody after that, anybody you talked to, about the conversation with Mr. Stewart. You never said to them, Mr. Stewart said there is something false in the memo?
*142 A. That’s correct, I never said that.

 Admittedly, Preston’s testimony about when he spoke with Stanek varied. See note 28 of this opinion.

 See Bose, 466 US at 512 (“[Defendant employee] had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no mistake had been made — that the inaccurate was accurate. That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication.”) (emphasis added).

 When the trial court issued its bench ruling on Barrows’s motion for a directed verdict, the court concluded that although the evidence permitted “an inference” that Barrows acted with reckless disregard, *145 there was no evidence that Barrows had actual knowledge of falsity. Plaintiff did not appeal this adverse ruling.

 MCL 600.2911(6).

 VanHuystee testified in pertinent part:
Q. So when you say that Mr. Barrows asked you whether [plaintiff] had done anything illegal you didn’t know one way or another, did you?
A. That’s correct.
Q. You told him, I don’t know of anything she did illegal?
A. That’s correct.
Q. But you also told him I don’t have any idea?
*146 A. That’s correct.

 St Amant, 390 US at 731.

 Garrison, 379 US at 74.

 Harte-Hanks, 491 US at 692 (citation omitted).

 Id. at 682.

 Id. at 682-683.

 Id.; see also St Amant, 390 US at 731 (“[R]eekless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.”).

 St Amant, 390 US at 731.